Filed 4/24/26  K.W. v. Superior Court CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| K.W.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY SAN FRANCISCO,<br><br>    Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | A175667<br><br>(San Francisco County Super. Ct. Nos. JD24-3186, JD24-3186A, JD24-3186B) |

Petitioner K.W. (Mother) petitions for writ review (Cal. Rules of Court, rule 8.452) and requests a stay of a juvenile court order terminating reunification services and scheduling a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  Mother contends that the court erred in finding that real party in interest San Francisco Human Services Agency (Agency) provided or offered her reasonable reunification services.  She further contends that the court abused its discretion by terminating

---

[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code, and all rule references are to the California Rules of Court.

reunification services as to her three older children while continuing to place her youngest child with her. We disagree and deny the petition.

## I. BACKGROUND

### A. Detention

In October 2024, the police responded to a report of domestic violence involving Mother and her partner, M.V., who is the father of her youngest child, then three-month-old T.V. Mother suffered a fractured leg and cuts and bruises to her face.

In addition to T.V., Mother's three other children—D.R., T.R., and A.R. (the boys), who at the time were nine, eight, and six year-old boys, respectively—were present in the home during the assault.[2] D.R. and T.R. witnessed the assault. At the hospital, Mother confirmed that all four of her children were home during the assault and disclosed a prior domestic violence incident in which M.V. punched her.

After being notified of the incident by the police, the Agency sent a Protective Services Worker (PSW) to visit the children the day after the incident. In a detention report, the PSW noted that D.R. and T.R., the two older boys, appeared guarded and refused to answer questions about the domestic violence they just witnessed. Although he was not in the room when the attack occurred, A.R., the youngest boy, stated that "[M.V.] kicked, punched, kicked and punched" while he made punching and kicking motions. A.R. further stated, "Mom crying. Get a knife and stab her."

Mother told the PSW that she did not want to press charges against M.V. and that she "did not understand why there was a Child Endangerment charge against [M.V.]" Although Mother admitted other domestic violence

---

[2] At the time of this incident, the boys' biological father was incarcerated and unavailable. He is not a party to this writ petition.

incidents, she told the PSW that she accepted M.V.'s apology and " 'want[ed] him home.' " Mother also stated that the boys had been in their biological father's custody until he was incarcerated, and she admitted that they had not attended school while in her care for the past year.

The Agency detained all four children, placing the boys in foster care and T.V. with a family member. The Agency also filed a section 300 petition on behalf of the boys.[3]

At the detention hearing, the juvenile court found a prima facia case that the boys came within section 300, ordered their continued detention and placement in foster care, and set a contested jurisdiction/disposition hearing. The court provided for unsupervised visits with Mother while she remained in the hospital and supervised visits once she was discharged and after the Agency assessed Mother's home. The court also gave the Agency discretion to allow monitored or unsupervised visits or to release the boys to Mother's care if she entered a "confidential program" and a restraining order was served on M.V.[4]

## B.  Jurisdiction/Disposition

In its jurisdiction/disposition report, the Agency recommended that the allegations of the section 300 petition be sustained, that the children be declared dependents, and that reunification services be ordered for Mother. The report confirmed that Mother entered a confidential program after being discharged from the hospital. Despite her injuries, Mother was "able to transport herself to meetings with the Agency and to attend all of her visits

---

[3] The Agency filed a separate section 300 petition on behalf of T.V. T.V.'s petition is not at issue here.

[4] After the hearing, the juvenile court issued a temporary restraining order against M.V. protecting Mother and all four children. The court later issued a permanent three-year restraining order.

with her children." As later testified to by a PSW, the Agency transported Mother to those visits for a period of time while she was still injured using its vehicles and staff.

The report further revealed that "[Mother] could not recall the last time she took the children for medical care," explaining that she was only able to "keep up" with T.V.'s medical care. The report detailed the family's extensive history with child welfare services and multiple referrals for neglect, physical and emotional abuse, unsanitary living conditions, and lack of medical care and supervision. It also disclosed that Mother had a history of methamphetamine and marijuana use. According to the report, "[i]nstead of being children, [D.R. and T.R. have] been parentified to watch out for each other and their baby sister." All three boys had "emotional and behavioral health concerns that directly have a negative impact on their well-being." Indeed, the boys had to be separated for placement because they often fought, and each had to change placements due to behavior problems.

Although "it [was] unclear if [Mother] truly appreciate[d] the gravity of what happened to her and the damage this caused the children," the report recognized her participation in programs to reunite with her children. It concluded that Mother "must demonstrate that not only can she provide for [the boys'] basic needs, medical care and education (which they were missing), [Mother] must demonstrate that she can access and learn skills and enhanced parenting practices for when the children inevitably start talking to her about the violence they witnessed." The Agency identified several services that Mother had to utilize to achieve reunification, including therapy, a parenting class, and a survivors of domestic violence program.

A month later, the Agency filed an addendum report. Although the addendum stated that "there [were] no longer the big outbursts of

4

aggressions" by the boys, "all of the caregivers request[ed] mental health supports for all of the children" because they struggled to regulate their emotions. There were no apparent concerns about Mother's behavior at her supervised visits with the children.

The addendum also stated that Mother had "proactively brought herself to [La] Casa De Las Madres" to avail herself of "psychoeducational classes regarding domestic violence" but was told she needed a referral. After Mother obtained a referral, however, she did not attend the intake appointment because "she was dealing with a lot of stressors." The addendum further stated that Mother was "reluctant" to "re-connect and engage with her natural supports to develop a safety plan" because it was "up to her to get her children back and that [no one] is going help her anyway." According to the PSW, Mother also discounted the benefit of individual therapy but said, "she will do it if she is 'forced' to do so." The PSW explained to Mother that the Agency needed to see behavioral changes, not just the completion of services.

At the jurisdiction/disposition hearing, the juvenile court sustained the allegations of child abuse and neglect pursuant to section 300, subdivisions (b)(1), (b)(3), (g)(2), and (j)(1). It also found that there was a substantial danger to the boys' physical safety and well-being if returned home and that the Agency had made reasonable efforts to eliminate the need for removal of the boys. Finally, the court found that Mother had made "[a]dequate" progress toward alleviating the causes of the placement and identified July 10, 2025 as the likely date the boys would be returned home. Accordingly, the court declared the boys dependents of the court, continued their foster care placements, and ordered reunification services and a psychological evaluation for Mother.

5

## C.    Six-Month Review

In the Agency's six-month status report, newly assigned PSW Elizabeth Landon noted that Mother had demonstrated that she could provide for T.V.'s basic needs and had been reunited with T.V. following a successful 30-day visit.  Landon further stated that Mother "had demonstrated incremental positive changes."  Mother also told Landon that she "receives WIC, CalWORKS, and food stamps" and was "able to take advantage of programs that provide items such as diapers, food, and toys to assist her in caregiving for [T.V.]"

Regarding the boys, the report stated that Mother regularly attended the visits offered to her and that those visits were generally positive.[5]  But Mother struggled to manage the boys' behavior, sometimes requiring visits to end early.  Landon concluded that Mother "appears to still need support in gaining the skills to navigate her [boys'] high behavioral needs during visits."

Despite this, Mother had shown a "lack of follow-through with the majority of service referrals" and had "minimally taken advantage of" support services available from her housing program.  For example, despite multiple referrals to La Casa De Las Madres, Mother did not complete the intake assessment until approximately five weeks before the six-month review hearing.  Mother also did not follow through with her court-ordered psychological evaluation due to "difficulty maintaining contact" with the psychologist.  After being "linked with an individual clinician for therapy," Mother only attended two sessions, claiming that she believed the service was completed despite multiple phone calls and e-mails from the clinician.  Relatedly, a referral to SafeCare parenting classes had been closed because

---

[5] By this time, the Agency had stopped providing Mother transportation to visits.

Mother had not engaged. Later, Mother told Landon that she found a new parenting class. But when Landon contacted the provider, she learned that Mother "enrolled late and missed the first session . . . [and] attended session two and three but missed the following two classes and [had] not completed any makeups . . . ."

Landon further expressed concerns about Mother's comments denying that she experienced domestic violence, stating that she missed M.V. and downplaying the negative effects domestic violence had on her children. Mother later contradicted those comments when she told Landon, "she did not want to resume a relationship with [M.V.] at [the] time and wanted to focus on herself and her kids."[6]

At the six-month status review hearing, the juvenile court found that the boys could not be returned to Mother's custody and that the Agency provided or offered Mother reasonable reunification services. The court found Mother's progress on her case plan to be "[a]dequate" and ordered continued services until the 12-month status review hearing.

### D. Interim Review

Roughly two months after the six-month status review hearing, Landon filed an interim progress report informing the juvenile court that Mother was still minimally engaged in services and that the Agency had suspended her visits with the boys.[7] Specifically, Mother had not yet attended a class in the

---

[6] Landon also outlined other concerns. For example, Mother refused to enroll T.V. in daycare or use her natural support system because she did not want "people to 'be in her business;' " she returned home in the wee hours of the morning; and she suspected she may be pregnant from an unidentified individual. Mother also missed appointments to discuss A.R.'s educational assessments.

[7] The juvenile court originally ordered the progress report to address lingering questions concerning the Indian Child Welfare Act.

SafeCare parenting program, had not re-engaged in individual therapy despite a third referral, and had not completed the court-ordered psychological evaluation. Mother's visits with the boys had also grown "sporadic" as she "missed multiple visits."

After talking to Landon, Mother agreed to a number of conditions so she could resume visits, including a reduced visitation schedule and early arrivals. Landon also provided Mother with "a fast pass and transportation check" for the next month. But two days after their discussion, Mother texted Landon to complain about taking public transportation to the visits—which were outside San Francisco. Mother asked the Agency to resume transporting her door-to-door for her visits with the boys, like when she was injured, but Landon explained the Agency could not do so. Landon further explained the Agency's expectation that parents travel longer distances than children for visits. Mother replied that she would not make the next visit and would instead seek virtual visits, resulting in the suspension of her visits with the boys.

After the interim review hearing was continued, the Agency filed a second progress report. The report stated that Mother was now participating weekly in the SafeCare parenting program but had stopped participating in domestic violence services. She also had made no progress with therapy or her psychological evaluation. Mother's visits remained suspended and there were no updates concerning virtual visits.

At the interim review hearing, Mother appeared and the court admonished her to visit the boys and to complete her services and reunification goals.

### E.    12-Month Review

In its 12-month status review report, the Agency recommended termination of Mother's reunification services for the boys.  At that time, Mother only had a month left of her transitional housing; yet, she was not availing herself of resources to find new housing.  Mother also continued to resist using public transportation, even when subsidized by the Agency, "unless it [was] her only option."  Instead, she relied on friends for rides to visits and, on one occasion, paid for a taxi to get to a visit in San Francisco.

As for Mother's progress with her case plan, the report relayed that Mother started attending SafeCare classes and completed the court-ordered psychological evaluation on October 23, 2025.  Per the evaluation, she was diagnosed with a mild intellectual disability (intellectual developmental disorder), other depressive disorder, and other specified anxiety disorder.  As a result, it was recommended that she attend individual therapy, complete a substance abuse assessment, attend domestic violence services, and "attend an initial assessment at Golden Gate Regional Center [(GGRC)] to determine her eligibility for services."  However, Mother never participated in individual therapy, despite four referrals, and her participation in domestic violence services was intermittent.

Mother's supervised visits with the boys had resumed after the interim review hearing.  Landon arranged for the next two visits to be in San Francisco, which Mother attended, and Mother was able to transport herself to the next two visits outside the city.  But Mother cancelled the next four visits, again resulting in suspension of visits.  Because the visits with T.R. and A.R. were held separately from the visits with D.R., Landon was unable to assess Mother's parenting capacity with all children present.  The report also noted that Mother struggled to remain engaged in the boys' educational

9

needs. The Agency recommended virtual visits to help maintain her contact with the boys.

The Agency expressed concern about Mother's ability to provide stability and safety for the boys if they were returned to her custody. In view of Mother's lack of engagement in individual therapy and domestic violence services, the Agency also expressed concerns about her ability to address the children's trauma and to protect them from further exposure to domestic violence. The report highlighted how Mother's reticence to use public transportation, even within San Francisco, and her refusal to enroll T.V. in daycare called into question her "capacity to utilize the resources available to her should the [boys] be returned to her care . . . . " Given Mother's unwillingness to rely on her natural support system, the Agency was skeptical she could meet the basic needs of all four children when together, especially the boys' therapeutic and emotional needs, or that she could control the boys' behavior. Thus, the Agency recommended that reunification services be terminated.

The 12-month review hearing was continued to February 2026, and the Agency submitted an addendum report. Mother's living situation had not yet changed, but her exit from transitional housing was scheduled to occur within a week. Despite this, Mother refused to live in a housing program the Agency referred her to because she did not like the restrictive rules of the program. Instead, she stated that she would utilize a hotel shelter program while awaiting more permanent housing from the CalWORKS housing support program.

Mother's engagement with services remained spotty. After a belated start, she had been participating in the SafeCare parenting program and only

had seven sessions left. But she missed several appointments for domestic violence services provided by La Casa De Las Madres.

Meanwhile, Mother did not visit T.R. or A.R.—who were placed outside of San Francisco—because she still refused to take public transportation, citing her anxiety. And despite D.R.'s placement in San Francisco, Mother refused to visit him until he was moved to a different visitation center in the city. She told Landon that a friend drove her to those visits. After recapping these developments, the Agency maintained its recommendation to terminate reunification services.

The contested 12-month review hearing took place on February 6, 2026—16 months after the children's initial detention. The juvenile court received in evidence the Agency's six-month status review report, 12-month status review report, and addendum report, and heard testimony from Landon and Mother.

Landon testified about Mother's inconsistent participation in services, her failure to attend individual therapy, and her lack of insight into the effects domestic violence had on her children. According to Landon, Mother "understood the purpose for which the services were ordered" and she would "rephrase or re-explain or work with [Mother]" when it appeared Mother was struggling to understand information being conveyed. When asked about the recommendations based on Mother's psychological evaluation, Landon explained that she provided "the information for the intake line [at GGRC] to [Mother] and encouraged her to call and schedule an intake for herself." Landon explained that she provided the information to Mother "on multiple occasions during [their] in-person contacts." She also asked Mother on multiple occasions whether she "needed assistance with enrolling in various

11

services, and [Mother] indicated she did not," including for services that had "a self-referral process for intake."

When asked how the Agency accommodated Mother's visits, Landon replied that "[t]he Agency provided financial . . . assistance" and that she "offered and helped [by] outlin[ing] what the route for public transportation would be like." Landon continued: "the Agency repeatedly referred [Mother] to individual therapy where she might explore her anxiety and how to best handle those stressful situations on public transportation." According to Landon, it was the Agency's policy that parents bear the burden of transportation, explaining that the initial use of Agency staff to transport Mother ended "due to the realistic need for those resources to be utilized elsewhere, as well as the need for [Mother] to demonstrate her capacity to utilize her own resources to meet the request of the Agency that she demonstrate a capacity to visit with her boys."

Landon also testified that the boys had to be taken out of school to attend visits with Mother. She further explained that accommodating Mother's request that the Agency transport the boys to San Francisco for visits would require them to miss an entire day of school, which would not contribute to their well-being.

Mother testified about her difficulty attending visits due to her anxiety and lack of familiarity with the public transit system. She also said that she had trouble contacting some of the services she was required to participate in and that she sometimes had a hard time understanding things. When asked why she had not participated in therapy or the domestic violence program, Mother stated that no one had contacted her. Mother claimed that she understood that domestic violence had an impact on her children but criticized the domestic violence program as "not a class to [her]."

Following closing arguments by counsel, the juvenile court took the matter under submission. Four days later, the court delivered its ruling. Explaining that it took a "trauma-informed approach," the court found clear and convincing evidence that the Agency provided reasonable services to Mother. The court concluded that Mother was unlikely to reunify with the boys by the 18-month review hearing and that returning the boys to her custody would create a substantial risk of detriment to their well-being. Accordingly, the court terminated reunification services and set a section 366.26 hearing. The court also kept T.V. with Mother and continued family maintenance services.

Mother filed a writ petition challenging the juvenile court's order (Petition).

## II. DISCUSSION

After removing a child from a parent's custody, the juvenile court must provide reunification services to that parent. (§ 361.5, subd. (a).) If the child is over the age of three, the presumptive period of reunification services is 12 months. (*Id.*, subd. (a)(1)(A).) If the child is not returned to the parent after the 12-month review, the court has options. (See § 366.21, subd. (g).) The court may continue reunification services for an additional six months, but "only if it finds [(1)] that there is a substantial probability that the child will be returned to the physical custody of their parent" and "safely maintained in the home within the extended period of time" or (2) "that reasonable services have not been provided to the parent . . . ." (*Id.*, subd. (g)(1); see § 361.5, subd. (a)(3).) Alternatively, the court may order a section 366.26 hearing only if it finds "clear and convincing evidence that reasonable services have been provided or offered to the parents . . . ." (§ 366.21, subd. (g)(4).)

Mother contends that the juvenile court erred by denying her request to continue reunification services because reasonable services were not provided. Mother further contends that the court's order terminating reunification services with the boys was "internally inconsistent" with its order maintaining services with T.V. and therefore constituted an abuse of discretion. We disagree.[8]

## A.    Standard of Review

We review a finding that reasonable reunification services were provided for substantial evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact

---

[8] The Agency asks this court to strike or deny the Petition on procedural grounds because Mother failed to " 'provide a summary of significant facts' " as required by rule 8.452(b)(1). Although the Petition does not include a factual summary, it does cite to the record whenever it makes a factual assertion. Because we must liberally construe the Petition, we consider its merits notwithstanding any procedural defects.

Although the Agency did not raise the issue, it also appears that Mother missed the deadline for filing the Petition by 3 days. Nonetheless, we will address the merits of the Petition because Mother likely received ineffective assistance of counsel. "[P]arents [in a dependency proceeding] may raise an incompetent representation claim based on the untimely filing of a notice of appeal." (*In re A.R.* (2021) 11 Cal.5th 234, 251.) And where, as here, counsel missed the deadline for filing the writ petition by three days *after* timely filing a notice of intent to file that petition, counsel was necessarily ineffective. (See *id.* at p. 252 [counsel is ineffective when "counsel was directed to file an appeal on behalf of a parent but failed to do so in a timely manner"].) For this same reason, the failure to timely file the Petition is prejudicial. (See *id.* at pp. 252–253 ["To ascertain prejudice, we focus on whether the parent would have taken a timely appeal, without requiring the parent to shoulder the further burden of demonstrating the appeal was likely to be successful"].)

finder could have found it highly probable that the fact was true."
(*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.) That record must be viewed in the light most favorable to the prevailing party. (*Id.* at p. 996.) Finally, we review "the juvenile court's decisionmaking process based on those findings for abuse of discretion." (*San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 223.)

### B. Reasonable Services

Mother argues that the Agency failed to tailor her reunification services to her intellectual disability and anxiety disorders or provide her with reasonable visitation. We are not persuaded.

Reunification services should be "tailored to suit the needs of the parents." (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 810.) But those services need not be perfect. (*In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 972.) Instead, the Agency need only make a reasonable effort to identify the problems leading to the loss of custody and to provide reasonable services to remedy those problems. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

According to Mother, the Agency erred by using "standard referrals and instructions that assumed average cognitive functioning" even though Mother suffered from an intellectual development disorder. Mother contends that "simply provid[ing] [her] with [a service provider's] intake telephone number and encourag[ing] her to call on her own" was inadequate. In making this contention, Mother focused on the Agency's efforts to arrange her intake with GGRC. But Mother does not dispute that Landon provided the intake information for GGRC "on multiple occasions during [their] in-person contacts" and even offered to assist her with signing up for services.

In any event, Mother's failure to attend an intake assessment at GGRC is the exception that proves the rule. Mother was able to enroll in numerous

services on her own, including a domestic violence program at La Casa De Las Madres and the SafeCare parenting program. She also admittedly enrolled in nutritional aid for T.V. on her own. Mother even availed herself of other public services, such as CalWORKS and food stamps, on her own. And at the 12-month review hearing, Mother explained in some detail the process for obtaining new housing, identifying the agencies she was working with and demonstrating a more than functional level of independence. Although Mother asserts that the "disability services system" was "more complex," she provides no support for this assertion. Thus, viewing the record in the light most favorable to the order, there is more than enough evidence to support the court's finding by clear and convincing evidence that the Agency provided reasonable services. Put another way, a reasonable fact finder could find it highly probable that Mother's failure to obtain individual therapy was not due to the Agency's failure to tailor the services to her intellectual disability.

Mother's cases are distinguishable. In *In re Victoria M.* (1989) 207 Cal.App.3d 1317, the mother had been diagnosed with mild mental retardation years before her children were taken into protective custody. (*Id.* at pp. 1320–1321.) Despite having access to that diagnosis "from the onset," the agency "failed to arrange a second evaluation" and "never considered" services offered by a regional center. (*Id.* at pp. 1329–1330.) By contrast, Mother took 10 months to complete her court-ordered psychological evaluation. And as soon as the Agency learned of the recommendation that Mother "attend an initial assessment at [GGRC] to determine her eligibility for services," it provided her with the necessary information multiple times and offered to help her with the intake process.

16

In *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1419, the Court of Appeal found that reasonable services had not been provided to developmentally disabled parents, one of whom was physically disabled. The parents' visits with their child were positive, they "fully cooperated with the Agency," and they "made substantial progress with their court-ordered case plans." (*Id.* at pp. 1426–1427.) Nonetheless, the agency limited the parents' visits because of a single incident where the child, "who was learning to walk, fell and bumped his head." (*Id.* at p. 1426.) In response, the father "picked his son up, wiped away his tears and followed [the social worker's] advice to put ice on a small lump on [the child's] head." (*Ibid.*) The Court of Appeal found no evidence that the parents had jeopardized the child's safety. (*Id.* at p. 1427.) It also found other viable ways to alleviate the agency's concerns about unsupervised visitation. (*Ibid.*) Finally, the parents did not receive other services the juvenile court deemed important. (*Ibid.*) For example, the disabled mother was not offered services designed to address her physical disabilities. (*Ibid.*) The Court of Appeal therefore held that the agency had unreasonably foreclosed family reunification on the basis of the parent's disabilities. (*Id.* at pp. 1427–1428.) There is no evidence of any remotely analogous missteps by the Agency here.

Finally, we do not find persuasive Mother's contention that the Agency failed to reasonably facilitate visitation with the boys. She avers that "reasonable services . . . required either continued transportation [by the Agency] for a reasonable period or concrete, disability sensitive steps to transition Mother to independent travel." However, the record shows that the Agency did take reasonable steps to facilitate the visits.

When Mother was recovering from her fractured leg, the Agency transported her. But after Mother's leg healed and she could move about

again, the Agency reasonably stopped transporting her itself. As Landon explained, the Agency needed to optimize its scant resources and Mother needed to demonstrate a capacity to utilize the resources available to her. Nonetheless, the Agency paid for Mother to take public transportation and even identified the routes for her to take. And recognizing that Mother was anxious about using public transportation, "the Agency repeatedly referred [her] to individual therapy where she might explore her anxiety and how to best handle those stressful situations on public transportation." But despite four referrals, Mother only completed two intake sessions and never followed up with the provider even though the provider "attempted multiple times to reach out to [M]other to re-engage." Given that Mother was able to obtain many other services on her own, we find sufficient evidence that the Agency took reasonable steps to help Mother attend the visits.

Mother's reliance on *In re Alvin R.*, *supra*, 108 Cal.App.4th 962 is misplaced. There, the father "had done all that was required of him under the plan." (*Id.* at p. 973.) Although the plan required that he engage in joint counseling with his child *after* the child had participated in eight individual therapy sessions, the agency "did not get around to signing [the child] up for a long time" and "submitted no evidence of having made a good faith effort to bring those sessions about." (*Id.* at pp. 966–967, 972–973.) Here, the Agency was not the obstacle preventing Mother from visiting her boys. Instead, it was her reticence to take subsidized public transportation and her failure to attend therapy designed to address her anxiety.

### C.    Purported Inconsistency

Finally, we reject Mother's contention that the decision to terminate reunification services for the boys while maintaining an in-home placement

18

for T.V. is "internally inconsistent and underscores the unreasonableness of terminating services." We find no abuse of discretion here.

There is nothing internally inconsistent with continuing T.V.'s in-home placement and terminating reunification services for the boys. T.V. was only 19 months old at the time of the hearing. By contrast, the boys were eleven, nine, and seven years old. Unlike T.V., who was not old enough to attend school, the boys were old enough to do so. Yet, they had not attended school for a year since being in Mother's custody. And unlike T.V., two of the boys had witnessed, and the third was aware of, the domestic violence that had precipitated their out-of-home placement.

These differences between the needs and circumstances of T.V. and the boys are more than sufficient to explain their differential treatment by the Agency. As the Agency explained at the 12-month review hearing, Mother had not "demonstrated the behavioral change [or] the developmental insight" needed to take care of her three "traumatized boys." There is substantial evidence to support this conclusion even though Mother claimed that she understood that the domestic violence "had an impact on [her] children." Indeed, the record establishes that the boys had significant emotional and behavioral issues and that Mother's participation in domestic violence services was woefully deficient. There was also ample evidence Mother could not manage all three boys at the same time during supervised visits.

T.V. did not suffer similar trauma or exhibit similar behavioral issues as the boys. Therefore, the Agency reasonably concluded that Mother could care for T.V. There was also evidence that Mother prioritized T.V.'s needs by, for example, signing up for programs that supplied baby food and diapers but did not prioritize visits with the boys. Accordingly, the juvenile court did not abuse its discretion in concluding that returning the boys to Mother's custody

19

created a substantial risk of detriment to their well-being, while keeping T.V. in her custody did not.

## III. DISPOSITION

The Petition is denied. The request for a stay is denied as moot.

CHOU, J.


WE CONCUR.


SIMONS, ACTING P. J.
BURNS, J.


A175667/ *K.W. v. Superior Court*